# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT M. WALLETT,** | : | |
| **Plaintiff** | : | Civ. No. 1:10-CV-2092 |
| v. | : | Honorable Sylvia H. Rambo |
| **PENNSYLVANIA TURNPIKE COMMISSION, JOSEPH G. BRIMMEIER and GEORGE M. HATALOWICH,** | : | |
| **Defendants** | : | |

## **M E M O R A N D U M**

Before the court is Defendants Pennsylvania Turnpike Commission ("PTC"), Joseph G. Brimmeier ("Brimmeier") and George M. Hatalowich's ("Hatalowich") motion to partially dismiss Plaintiff's complaint. (Doc. 1.) For the reasons that follow, the motion will be granted.

## I. **Background**[1]

Plaintiff, Robert M. Wallett ("Wallett"), was employed by the PTC until May 15, 2009, when he was dismissed after an internal reorganization. Defendants Brimmeier and Hatalowich are Commissioners for the PTC. Wallett claims that both the PTC and the individual Defendants have a long-established policy, practice or custom of participating in a political patronage system that allowed the awarding of PTC contracts to be influenced by politics instead of merit. Wallett claims that the

---

[1] As required when disposing of a motion to dismiss, all factual allegations in the complaint are accepted as true by the court.

reorganization of the PTC was a sham and done solely for the purpose of terminating Wallett because he would not participate in the political patronage system.

In 1997, Wallett retired from the United States Air Force and accepted a position with Science Applications International Corporation ("SAIC") in Washington, D.C. Prior to taking this job, Wallett applied for the position of Deputy Executive Director of Engineering and Maintenance for the PTC. During the interview process, he was told by Commissioners and staff members about "the merit selection and long-term employment opportunities offered by the [PTC]." (Compl. ¶15.) Ultimately, Wallett was not hired for this position, however, he remained interested in working for the PTC.

Several months after he commenced working at SAIC, Wallett received a phone call from the PTC asking him to interview for the position of Director of Maintenance. When SAIC discovered Wallett was being recruited by the PTC, they offered him a salary increase and other financial incentives in an effort to retain him. The PTC told Wallett that although his salary would be lower than at SAIC, he would be adequately compensated and would have "job security and stability." (Comp. ¶ 19.) Relying on this information, in August 1997, Wallett accepted the position of Director of Maintenance with the PTC, which required him to take a $12,000 salary cut.

In January 2003, a new administration took over the PTC and Wallett claims that this is when he learned of the political patronage system that was rampant throughout the organization. One of the first acts of the new administration was to hire the former Associate Executive Director of the PTC, Michael Palermo, "to help

2

the [PTC] transition and reorganize." (Compl. ¶ 25.) This reorganization was intended to reward individuals who were politically connected.

After the reorganization in May 2003, Wallett was told by Brimmeier that he was now the Director of Maintenance, not the Director of Facilities. An individual "sponsored" by Michael Palermo was placed in Wallett's former position. (Compl. ¶ 26.) This reassignment had the affect of demoting Wallett from a Grade 19 to a Grade 18 position.

As Director of Facilities, Wallett was charged with participating in the process outlined in Pennsylvania's Procurement Code and the PTC's Contracting Policies used to select architecture and engineering firms to be used for various PTC contracts. The process for selecting such firms is as follows: when a department identified a need for an architecture or engineering firm, a letter would be submitted to the Chief Operating Officer - Defendant Hatalowich - asking for approval to select from Letters of Interest. After the PTC approved advertising for the position, an announcement would be placed on the PTC's website and potential firms would submit Letters of Interest by the posted deadline. The Contracts Administration would then compile the information and provide it to the requesting department for evaluation. A summary of the interested firms is compiled and provided to the Technical Review Committee ("TRC") which would rank the firms from high to low. This list was used as the order of preference when selecting a specific firm for a job. The selected recommendations were then presented to the PTC at an informal meeting and subsequently approved at a formal PTC meeting.

Wallett followed the above-mentioned process and based his recommendations on "professional experience, qualifications, technical expertise,

3

resources, and documented performance on similar work." (Compl. ¶ 36.) He would objectively present this information to the TRC. The TRC was comprised of five voting members, including Defendants Brimmeier and Hatalowich. Wallett alleges that Brimmeier and Hatalowich conspired with each other and other members of the TRC to ensure that politically connected firms received PTC contract bids. Wallett claims that, at time, politically connected firms that received a "low" ranking were chosen were awarded contracts.

At his annual performance review, Wallett was told my his immediate supervisor that Hatalowich had lowered Wallett's ranking "because Wallett always provided selection recommendations . . . of consultants at the [TRC] and all they wanted was to know if a particular firm had the ability and resources to perform a particular contract so they could pick who they wanted to pick." (Compl. ¶ 40.) One company in particular, Orbital Inc., received low rankings by Wallett but was routinely awarded contracts. Wallett alleges that Orbital Inc. is connected to Robert Lewis, an individual who gave large contributions to certain political committees and candidates. Wallett claims Robert Lewis would threaten PTC employees who did not act "the way he wished, with retaliation by going to his 'friend' [Defendant] Brimmeier . . . ." (Compl. ¶ 41.) In addition, Wallett believes that he was repeatedly not selected to participate in the choosing of firms for long-term contracts because he was honest and not subject to political influence.

During his time at the PTC, Wallett believes that not only were politically connected firms getting contract bids, but also that politically connected individuals were being placed into positions without going through the standard hiring practices. As an example, Wallett points to an architect who was placed in

4

Wallett's department. In 2003, while Wallett was making an effort to submit a reorganization plan to the PTC, Defendant Brimmeier asked Wallett if his department needed an architect. Wallett in turn created such a position within the department that was approved by Brimmeier. Shortly after the position was created, Wallett was informed by the human relations department that the position would only be posted internally, not externally. Wallett was confused by this decision as he knew, based on personal experience, that there were no employees who had both an architectural degree and an AIA designation within the organization. Despite the perceived lack of a qualified individual for the job, Wallett was eventually provided an application by the human relations department. Wallett was instructed to conduct an interview with the candidate and recommend whether they were qualified or unqualified for the position, but was not told to interview anyone else. Wallett believes that the human relations department and Defendant Brimmerier worked together to ensure that this individual would be the sole candidate allowed to apply for the position because this individual was politically connected to Brimmeier and had worked with him on the gubernatorial campaign. This candidate was ultimately hired for the position.

Two years after being hired, the individual resigned from this position and the position has never been refilled. Wallett, along with others at the PTC, believed this hiring was inappropriate and a violation of PTC policy and possibly illegal. Wallett believes that such occurrences were common at the PTC. In essence, Wallett believes that positions would be designated as being open to applicants either internally or externally, but that external applications would be controlled so that only politically connected individuals would apply, thus skirting

5

law which banned political patronage systems. Wallett believes that Defendants became concerned that he would not go along with the system of placing politically connected individuals in positions and this led to his eventual termination.

On May 15, 2009, Wallett was terminated from the PTC without warning due to a "reorganization." On this day, Wallett was approached by the Director of Human Relations and the Chief Engineer and handed a letter saying his position was being eliminated as a result of an internal reorganization. He was told to collect his belongings and vacate the premises by one o'clock that afternoon. He was then escorted from the building and given a ride home by his boss. The Chief Engineer told Wallett he did not know about the reorganization or why this had happened.

More then two months after Wallett was terminated, the facilities department had still not been reorganized. From this, Wallett believes that the reorganization was a hoax in an effort to rid the PTC of individuals such as himself who would not support placing politically connected individuals into positions over equally or possibly more qualified applicants. Wallett believes that leaders at the PTC wanted to "capture control of the contracting function whereby they could receive political favors and cheat the [PTC] and people of Pennsylvania by overpaying politically favored contractors for shoddy services." (Compl. ¶ 61.)

Finally, in July 2009, the facilities department was reorganized. This reorganization created a new position titled "Manager of Facilities and Energy Management Operations." The posting explicitly stated that you needed to be a current PTC employee to apply. In August 2009, Wallett applied for the Manager of

Facilities and Energy Management position,[2] even though it was at a lower salary than the position he had previously held with the PTC. In November 2009, Wallett was interviewed, along with other internal applicants, by a panel comprised of various individuals including Defendant Hatalowich. The panel also interviewed an external candidate from the Pennsylvania Department of Transportation who ultimately received the job. Wallett contends that he was not selected for this position because Defendants conspired and used unfair and discriminatory practices to exclude him from the position even though he was the most qualified.

By the time the position was filled in July 2010, all employees who had previously reported to the Director of Facilities were now reporting to the Manager of Facilities and Energy Management Operations. Wallett claims that this is further evidence that the reorganization was a sham to get rid of Wallett.

### B. Procedural History

On October 8, 2010, Wallett filed the instant complaint (Doc. 1) against Defendants PTC, Bremmeier and Hatalowich, alleging violations of his First Amendment rights under 42 U.S.C. § 1983 and Pennsylvania common law claims of "Termination in Violation of Public Policy" and "Additional Consideration." On December 30, 2010, Defendants filed an answer (Doc. 10) and a motion to dismiss Counts Two and Three of the complaint (Doc. 11), along with a brief in support (Doc. 12). On February 3, 2011, Wallett filed a brief in opposition (Doc. 16), to

---

[2] It is unclear how, if Wallett had been termination and was no longer a PTC employee, he was able to apply for a position that was only advertised internally. However, this fact is not pertinent to the current motion to dismiss, as such, the court will not inquire further.

7

which Defendants replied on February 16, 2011 (Doc. 17). The motion is now ripe for disposition.

**II.        Legal Standard**

When presented with a motion to dismiss for failure to state a claim, the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions," *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009), and ultimately must determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, ___U.S.___, 129 S. Ct. 1937, 1950 (2009)).

The complaint must do more than allege the plaintiff's entitlement to relief; it must "show such an entitlement with its facts." *Fowler,* 578 F.3d at 211 (citations omitted). As the Supreme Court instructed in *Iqbal*, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 129 S. Ct. at 1950 (quoting Fed. R. Civ. P. 8(a) (alterations in original)). In other words, a claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id*.

"To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998

8

F.2d 1192, 1196 (3d Cir. 1993) (citations omitted); *see also Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007). The court may consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] document[s]." *Pension Benefit*, 998 F.2d at 1196. Additionally, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002) (citation omitted); *see also U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) ("Although a district court may not consider matters extraneous to the pleadings, a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.") (internal quotation omitted). However, the court may not rely on other parts of the record in making its decision. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994).

Finally, in the Third Circuit, a court must grant leave to amend before dismissing a civil rights complaint that is merely deficient. *See, e.g., Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007); *Weston v. Pennsylvania*, 251 F.3d 420, 428 (3d Cir. 2001); *Shane v. Fauver*, 213 F.3d 113, 116-17 (3d Cir. 2000). "Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility." *Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004).

### III.        Discussion

In the instant motion, Defendants move to dismiss Count One-Termination in Violation of Public Policy, and Count Two- Additional Consideration, of the complaint. Defendants argue there was no violation of a clear public policy, and that Wallett did not suffer a substantial economic hardship. The court will discuss each other these claims in turn.

### A. Termination in Violation of Public Policy

The general rule in Pennsylvania is that, absent a statutory or contractual provision to the contrary, employment is considered at-will. *Weaver v. Harpster*, 601 Pa. 488, 500 (2009). There is a very limited exception to this general rule when the "termination implicates a clear mandate of public policy." *Id.* at 503. However, "the power of the courts to declare pronouncements of public policy is sharply restricted." *Id.* Instead, the state legislature is in the best position to decide what the most important public policies of the Commonwealth should be. *Id.* Thus,

> [t]he right of a court to declare what is or is not in accord with public policy exists only when a given policy is so obviously for or against public health, safety, morals, or welfare that there is a virtual unanimity of opinion in regard to it. Only in the clearest of cases may a court make public policy the basis of its decision.

*Id.* (citing to *Mamlin v. Genoe (City of Phila. Police Beneficiary Ass'n)*, 340 Pa. 320, 409) (1941) (internal citations and quotations omitted)).

The traditional view held by Pennsylvania courts is that "exceptions to at-will employment should be few and carefully sculpted so as not to erode an employer's inherent right to operate its business as it chooses." *Id.* (compiling cases).

Neither party cites to any case directly on point, and the cases the court is directed to by both the litigants and other state courts fail to present a consistent

view for when a given policy has "so obviously" been violated. Seeing as the court and parties have failed to find any case law directly on point, and recognizing that the general rule in Pennsylvania is to strictly limit exceptions to the at-will employment doctrine, this court, sitting in federal jurisdiction, is unwilling to expand state law at this time. Thus, Plaintiff's Termination in Violation of Public Policy claim will be dismissed.

### B. Additional Consideration

A plaintiff may also overcome the at-will employment burden by showing they suffered additional considerations. *See Scott v. Infostaf Consulting, Inc.*, 2009 WL 3734137, at *5 (E.D. Pa., Nov. 6, 2009). In Pennsylvania, "[s]uch consideration has been found to exist 'if an employee bestows a legally sufficient detriment for the benefit of the employer beyond the services for which he was hired.'" *Id.* (citing *Ruzicki v. Catholic Cemeteries Ass'n of Diocese of Pittsburgh*, 610 A.2d 495 (Pa. Super. 1992)). Such considerations can include relocation expenses, forgoing other job opportunities and selling a home. *Id.*

In the instant case, Plaintiff was employed in Washington D.C. and was required to relocate to Harrisburg, Pennsylvania, for a lower salary. However, Plaintiff actively sought employment with the PTC and was informed from the beginning what his starting salary would be. Therefore, relocation and a pay reduction were not considerations Plaintiff was not well aware of when he actively applied for multiple positions with the PTC. In addition, Plaintiff was employed by the PTC for twelve years. The court fails to see how Plaintiff suffered a substantial hardship as a result of his decision to accept the PTC when he, as evidenced by the complaint, enjoyed twelve years of successful employment with the organization. In

addition, the complaint fails to allege that Plaintiff bestowed the PTC with "a legally sufficient detriment for the benefit of the employer *beyond the services for which he was hired.*" *See Scott, supra.* As such, Plaintiff has failed to state a valid additional consideration claim.

**IV.** <u>**Conclusion**</u>

For the aforementioned reason, Plaintiff's Termination in Violation of Public Policy and Additional Consideration claims fail as a matter of law and will be dismissed. The case will proceed on Plaintiff's First Amendment claim against Defendants. An appropriate order will issue.

s/Sylvia H. Rambo<br>United States District Judge

Dated: March 10, 2011.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT M. WALLETT** | : | |
| Plaintiff | : | Civ. No. 1:10-CV-2092 |
| v. | : | Honorable Sylvia H. Rambo |
| **PENNSYLVANIA TURNPIKE COMMISSION, JOSEPH G. BRIMMEIER and GEORGE M. HATALOWICH**, | : : : : : | |
| Defendants | : | |

## **O R D E R**

For the reasons stated in the accompanying memorandum of law, **IT IS HEREBY ORDERED** that Defendants' motion to dismiss Counts Two and Three of the complaint (Doc. 11) is **GRANTED**. The case will proceed on Count One of the complaint.

                                                              s/Sylvia H. Rambo
                                                            United States District Judge

Dated: March 10, 2011.