## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT M. WALLETT,** | : | |
| **Plaintiff** | : | **Civ. No. 1:10-CV-2092** |
| | : | |
| **v.** | : | **Honorable Sylvia H. Rambo** |
| | : | |
| **PENNSYLVANIA TURNPIKE** | : | |
| **COMMISSION, JOSEPH G.** | : | |
| **BRIMMEIER and GEORGE M.** | : | |
| **HATALOWICH, :** | | |
| | : | |
| **Defendants** | : | |

## M E M O R A N D U M

Before the court is Defendants Pennsylvania Turnpike Commission ("PTC"), Joseph G. Brimmeier and George M. Hatalowich's, motion for summary judgment. (Doc. 40.) For the reasons that follow, the motion will be granted.

## I.        Background

### a.      Facts[1]

Plaintiff, Robert Wallett, began working for the PTC in August of 1997 as the Director of Maintenance.[2] (Defs.' Statement of Material Facts ("SMF") ¶ 1.)

---

[1]        In *Forbes v. Twp. of Lower Merion*, 313 F.3d 144, 148–49 (3d Cir. 2002), the Third Circuit reaffirmed its supervisory rule first announced in *Vadino v. A. Valey Engineers,* 903 F.2d 253, 259 (3d Cir. 1990) that "the district courts in this circuit [must] accompany grants of summary judgment hereafter with an explanation sufficient to permit the parties and this court to understand the legal premise for the court's order." *Vadino*, 903 F.2d at 259; *see also* Fed. R. Civ. P. 56(a) ("The court should state on the record the reasons for granting or denying the motion."). Here, the court will identify those facts that are subject to genuine dispute, and cite to the record in order to highlight the precise nature of any disputed facts. The court will not cite to the record where the facts are undisputed; instead, the court will rely on the statements of material fact and admissions submitted by the parties. The materiality of any genuinely disputed facts will be analyzed in the discussion section below.

[2]        At all times relevant to this complaint, Plaintiff served as an at-will employee with

(continued...)

He was originally hired under a Republican administration and at all times relevant to this complaint has be a registered Republican.  (Pl.'s SMF ¶ 1.)

In May 2003, Defendant Joseph G. Brimmeier, Chief Executive Officer ("CEO") of the PTC, transferred Wallett from the position of Director of Maintenance to Director of Facilities.  (Defs.' SMF ¶ 3.)  As Director of Facilities, Plaintiff participated in the consultant selection process when a need for services was identified.  (*Id.* ¶¶ 6, 7.)  These services were generally mechanical, electrical, or environmental.  (*Id.* ¶ 8.)  When a service was needed, the PTC's Office of Contracts Administration would obtain approval from the Commissioners to solicit letters of interest from contractors hoping to fill the job.  (*Id.* ¶ 9.)  When a letter of interest was received, it was submitted directly to the Office of Contract Administration and then forwarded to the Director of the requesting department.  (*Id.* ¶ 11.)  As Director of Facilities, Plaintiff would be individual who would receive such letters and, in turn, assign them to staff members to review and summarize.  (*Id.* ¶ 12.)  Occasionally, Plaintiff would discuss these summaries with staff members in order to determine which contractor would be the best fit for the job.  (*Id.*)  Plaintiff would then send these summaries back to the Office of Contract Administration and they would be placed on the schedule to be discussed during the next meeting of the Technical Review Committee ("TRC").  (*Id.* ¶ 13.)

The Facilities Department was a section of the Engineering Department, and a TRC was in charge of selecting engineering contractors to recommend to the PTC Commissioners.  (*Id.* ¶ 14.)  The TRC, at all relevant times, consisted of

---

[2] (...continued)
the PTC.  (Defs.' SMF ¶ 2.)

Defendants Brimmeier and Hatalowich, the Chief Engineer of the PTC, the Assistant Chief Engineer in the area of expertise in the specific contract, the Manager of Contracts Administration, and an individual appointed by the CEO of the PTC. (*Id.* ¶ 15.) During his time with the PTC, Plaintiff attended somewhere between four and six such meetings with the TRC. (*Id.* ¶ 16.) The degree of Plaintiff's participation in these meetings is disputed, but it is agreed that Plaintiff would convey his department's summaries of the applicants and their rankings to the TRC. (*Id.* ¶ 19; Pl.'s SMF ¶ 19.) Because the contracts in question here were for professional services, contracts were awarded based upon qualifications of the bidders, not necessarily to the lowest bidder. (*Id.* ¶ 17.)

After Plaintiff presented the application summaries to the TRC, the permanent members of the TRC and Plaintiff would use a ballot to vote on the proposed applicants. (*Id.* ¶ 20.) The Manager of Contracts Administration would then tally the votes and submit them to the Commissioners. (Defs.' SMF ¶ 21.) The TRC was not told who the winning applicant was, and this decision was not made public until the Commissioners awarded the contract. (*Id.*) Despite the TRC's recommendation and ranking process, the ultimate selection of an applicant to be awarded a contract was left to the Commissioners themselves. (*Id.* ¶ 18.) Plaintiff claims that members of the TRC were improperly influenced by Defendants Brimmeier and Hatalowich when ranking applicants. (Pl.'s SMF ¶ 20.)

During Plaintiff's tenure with the PTC, the summaries prepared by the Facilities Department became more general and amounted to nothing more than recitations of the qualifications of candidates. (*Id.* ¶ 22.) Plaintiff claims this was "intentionally done by [Defendant] Hatalowich and served the purpose of allowing

the defendants to influence the votes of the other Committee members more effectively and efficiently by eliminating embarrassing adverse information." (Pl.'s SMF ¶ 22.)  Plaintiff believes that he was terminated from the PTC because he failed to recommend firms that were politically connected to Defendants Hatalowich and Brimmeier.  (Defs.' SMF ¶ 24.)  Defendants claim Plaintiff has this belief because Hatalowich or Brimmeier would, occasionally, suggest additional firms to be added to the list presented to the TRC.  (Defs.' SMF ¶ 25.)  Plaintiff denies this fact and instead claims

> Plaintiff's belief that CEO Bremmeier and/or COO Hatalowich wanted to fire him is based on the fact that discovery now shows they attempted to fire him in 2003 and again in 2008, plus the fact they were actually telling other members of the TRC who to vote for but did not directly approach Plaintiff to tell him who to vote because they did not trust him since he was a Republican merit selection from the prior administration and had a record and reputation of following the rules and procedures that had been established to avoid political selection of contractors and consultants.  Plaintiff's failure to change and provide support caused the Defendants to revert to their 2003 original plan to remove Plaintiff completely notwithstanding his value as an employee.

(Pl.'s SMF ¶ 25.)  Plaintiff cites to nothing in the record to support this broad statement.  Plaintiff is only able to state with certainty one firm that he believes was politically connected to Brimmeier and/or Hatalowich and was awarded jobs because of this connection — Orbital Engineering, Inc.  ("Orbital").  However, Plaintiff admits that he too had recommended Orbital for certain Facilities Department jobs.  (*Id.* ¶¶ 30, 31.)  Furthermore, the last job Orbital was awarded was in 2007, nearly two years before Plaintiff's termination.  (*Id.* ¶ 32.)  Plaintiff does not argue that the firms Hatalowich or Brimmeier suggested were unqualified to complete Facilities

Department jobs; rather, he believes other firms could do the work more efficiently. (*Id.* ¶ 37.)  Regarding Orbital, Plaintiff's belief that Orbital was inefficient was based on the fact that the company was known to have a high rate of turnover.  (*Id.*)

Plaintiff never complained to either Brimmeier, Hatalowich or anyone else at the PTC about his concerns regarding contract awards, however, he did make a comment to his then supervisor, Al Jansen, regarding PTC hiring practices.  (*Id.* ¶¶ 40, 46, 49, & 56.)  Plaintiff concedes that two individuals who had been hired were well qualified applicants, however, Plaintiff argues the PTC should have explored more applicants and that these hires were politically motivated.  (*Id.* ¶¶ 43, 47, 48.) Plaintiff states that he did not ask that corrective action be taken and that he was merely "venting" to Mr. Jansen, not seeking a remedy for his concern that the hirings were politically motivated.  (*Id.* ¶ 40.)  Nor was Plaintiff himself applying for these positions.  Plaintiff himself claims that he went along with the hirings even though he believed they were politically motived, because he did not want to be a "squeaky wheel," (*id.* ¶ 55), Plaintiff further states that the only basis he had for thinking both the hiring and his subsequent firing were politically motivated was his personal "belief."  (*Id.* ¶ 55.)

Plaintiff was terminated on May 15, 2009.  (*Id.* ¶ 58.)  His termination was based on Brimmeier's decision to eliminate the position of Director of Facilities. (*Id.* ¶ 59.)  Hatalowich played no role in the decision to terminate this position.  (*Id.* ¶ 60.)  Brimmeier claims his decision to terminate this position was made "in an effort to move the PTC in a new direction of improved energy policies with a focus on energy conservation initiatives."  (*Id.* ¶ 61.)  In addition, Brimmeier stated in his deposition testimony that he was "disappointed in the way that [Plaintiff] was

handling [] things . . . [and Brimmeier] was not happy with [Plaintiff's] performance and his energy, his dedication to the job, et cetera; that [Brimmeier] believed, you know, a better job could have been done." (Defs.' Ex. 5, Dep. Joseph G. Brimmeier, at 53:15-22.) In response to this statement of material fact and to Brimmeier's deposition testimony, Plaintiff states as follows:

> The allegation in paragraph 61 are denied. The Plaintiff had proposed active energy policies and the creating of a job position to monitor and improve energy usage in 2003. This proposal was never responded to in an affirmative fashion. Moreover, CEO Brimmeier stated to Frank Kempf the day before Plaintiff's termination that he had two reasons for reorganization (1) the Plaintiff's conduct in the TRC and (2) the fact that the Plaintiff had not hired a contractor specializing in electrical usage that had been referred by Brimmeier.

(Pl.'s SMF ¶ 61.) The court is not aware if the contractor referred to in this statement was one that has been reviewed by a TRC.

Approximately three months after Plaintiff's termination, the position of Manager of Facilities and Energy Management Operations was created within the PTC. (Defs.' SMF ¶ 62.) Plaintiff applied and was selected for an interview in November 2009. (*Id.* ¶ 63.) Defendant Hatalowich was one of four members on the interview panel. (*Id.* ¶ 64.) Plaintiff admits that during his time at the PTC he had a good working relationship with all members on the interview panel. (*Id.* ¶ 65.) Ultimately, Plaintiff was not selected for the open position.

Defendants maintain that the individual hired for the position was just as qualified as Plaintiff. (*Id.* ¶ 66.) Support for Defendants' argument can be found in the candidate's resume which Plaintiff has provided the court. The resume reflect that the candidate had supervisory experience with the Pennsylvania Department of Transportation dating back to 1993 and other relevant experience dating back to

1980.  (Pl.'s Ex. 28.)  Plaintiff argues that this individual was selected at the direction of Hatalowich and that other members on the panel "got a clear message that notwithstanding Plaintiff's qualifications, he was not to be selected for the position nor even voted upon."  (Pl.'s SMF ¶ 66.)

### b.   Procedural History

On October 8, 2010, Wallett filed the instant complaint (Doc. 1) against Defendants PTC, Bremmeier, and Hatalowich, alleging violations of his First Amendment rights and retaliation under 42 U.S.C. § 1983 and Pennsylvania common law claims of "Termination in Violation of Public Policy" and "Additional Consideration."  On December 30, 2010, Defendants filed an answer (Doc. 10) and a motion to dismiss Counts Two and Three of the complaint (Doc. 11).  This motion was granted my memorandum and order dated March 30, 2011, and the case was allowed to proceed on Count One only.  (Doc. 20.)

Subsequently, on April 23, 2012, Defendants filed a motion for summary judgment and brief in support.  (Docs. 34 & 35.)  On May 21, 2012, Plaintiff filed a brief in opposition (Doc. 50), to which Defendants replied on June 7, 2012 (Doc. 53).[3]  As such, the motion is now ripe for disposition.

## II.      Legal Standard

Federal Rule of Civil Procedure 56 sets forth the standard and procedures for the grant of summary judgment.  Rule 56(a) provides, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute

---

[3]      In addition, Plaintiff has filed a Motion for Disclosure (Doc. 38) and Defendants have filed a Motion in Limine (Doc. 40).  Both of these motions have been stayed pending the dispostion of the instant motion for summary judgment.

as to any material fact and the movant is entitled to summary judgment as a matter of law.  Fed R. Civ. P. 56(a)[4]; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323. A factual dispute is "material" if it might affect the outcome of the suit under the applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the nonmoving party. *Id.* at 248.  When evaluating a motion for summary judgment, a court "must view the facts in the light most favorable to the non-moving party," and draw all reasonable inferences in favor of the same.  *Hugh v. Butler Cnty. Family YMCA,* 418 F.3d 265, 267 (3d Cir. 2005), *cert denied*, 546 U.S. 1094 (2006).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)*.*  "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."  *Azur v. Chase Bank, USA, Nat. Ass'n,* 601 F.3d 212, 216 (3d Cir. 2010).  The nonmoving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex*

---

[4] *See* Fed. R. Civ. P. 56, Advisory Comm. Note (2010 Amendments) (The frequently cited standard for summary judgment is now set forth in Rule 56(a) rather than Rule 56(c)(2010). The Advisory Committee explains that despite the language change, "[t]he standard for granting summary judgment remains unchanged" and "[t]he amendments will not affect continuing development of the decisional law construing and applying these phrases.").

*Corp.*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana v. Kmart Corp*, 260 F.3d 228, 232 (3d Cir. 2001) (citations omitted).  Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23.  "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III.        Discussion

Wallett claims political patronage discrimination in violation of 42 U.S.C. § 1983, when his position as Facilities Director was eliminated due to a reorganization within the PTC and that he was subsequently retaliated against when he was not hired for a different position seven months later.  Wallett claims this discrimination was rooted in his failure to recommend politically connected firms for construction bids within his department and for not agreeing in the way that various hiring practices took place within the PTC.

Section 1983 states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes."  *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 749 n.9 (1999) (internal quotation omitted).  To prevail in an action under § 1983, a plaintiff must demonstrate: (1) a violation of a right secured by the Constitution and the laws of the United States and (2) that the alleged deprivation was committed by a person acting under color of state law. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000);  *Moore v. Tartler*, 986 F.2d 682, 685 (3d Cir. 1993).  "The first step in evaluating a section 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.'"  *Nicini*, 212 F.3d at 806 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998)).

The Supreme Court has made clear that "promotions, transfers, recalls, and hiring decisions involving public employees may not be based on party affiliation and support unless the Government can show that party affiliation is an appropriate requirement for the position involved."  *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 663 (3d Cir. 2002) (citing *Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990)).  Thus, taking an adverse employment action based on someone's political tendencies constitutes a violation of the individual's First Amendment rights.  *Id.*  This protection extends to "government employees who lack a political affiliation" or who are apolitical.  *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 268 (3d Cir. 2007).  Defendants in this case do not dispute, for the purposes of disposing of the instant summary judgment motion, that not hiring Plaintiff for the

position of Manager of Facilities and Energy Managment Operations was an adverse employment action.  (Doc. 35, Defs.' Br. Supp. Mot. for Summ. J., at 9, n. 3.)

To establish a political patronage discrimination claim, a plaintiff must satisfy the following three elements: "(1) that the employee works for a public agency in a position that does not require a political affiliation, (2) that the employee maintained an affiliation with a political party, and (3) that the employee's political affiliation was a substantial or motivating factor in the adverse employment decision."  *Goodman*, 293 F.3d at 663-64.

The third prong requires that a plaintiff produce evidence sufficient to show a defendant knew of a plaintiff's political persuasion.  *Id.* at 664.  This prong is commonly called the causation prong — thus, the political preference must have been such a substantial or motivating factor so as to cause the decision not to promote.  *Id.* at 673.  The court will address the first prong and will then address the second and third prongs together.

### a.   Political Affiliation Requirement

The parties do not dispute that the PTC is a public agency whereat Plaintiff was employed.  However, it is disputed whether this position was one for which political affiliation is not required.  Defendants argue that Plaintiff held a "Senior-Level, Policy-Making Position" and therefore is not entitled to the protections of freedom of association.  Positions which require a certain political leaning are less protected than those which require no political affiliation for fulfillment of the job.  *See Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 663 (3d Cir. 2002) ("the Supreme Court has held that public agencies may not constitutionally discharge employees based on their political affiliation when those

employees' positions are neither policymaking nor advisory.")  Because the court finds that Plaintiff's claim for political patronage discrimination fail regardless of whether or not Plaintiff was a senior-level policy maker or not, the court need not address this prong and for purposes of the disposition of the instant motion will assume Plaintiff's position of Facilities Director required no political decisionmaking.

### b.   Affiliation With a Political Party and Causal Connection to Dismissal

Plaintiff claims he was hired by a Republican administration and is himself a registered Republican.  However, the record is devoid of any additional information regarding his political propensities, either active or not.  Plaintiff claims he was "not trusted" when it came to decisions made at TRC meetings because of his political affiliations, but fails to point to *any* evidence, either direct or circumstantial, to support such a claim.  In addition, there is absolutely nothing in the record to suggest Defendants were actually aware of Plaintiff's political affiliation or that they made any employment actions based on their desire that Plaintiff participate either more or less in any political processes.

Plaintiff claims that members of the TRC were improperly influenced by Defendants Hatalowich and Brimmeier to award bids to firms who these Defendants supported.  Plaintiff claims that Defendants did not approach him to support such firms because of Defendants' distrust of Plaintiff as a result of his Republican registration.  However, in the same breath, Plaintiff admits that firms that were chosen for certain bids were firms for which he had previously approved. It appears to the court this is far less a case of political party affiliation tied to an

employment dismissal and far more a difference of opinion regarding which firm was best suited for a particular job.

Even if the court accepts Plaintiff's belief that the firms who were awarded the construction jobs in question were favored by either Hatalowich or Bremmeier, the court fails to see how the award of these bids was a "substantial or motivating factor" in Plaintiff's termination.

Furthermore, should the court accept Plaintiff's unsupported "beliefs" and conclude that the above three elements for political patronage discrimination have been established, Defendants are still entitled to rebut this presumption by bringing forth evidence to show "that the same employment action would have been taken even in the absence of the protected activity." *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 271 (3d Cir. 2007). In the instant case, Defendants have produced sufficient evidence to make that showing. For example, Defendants have produced evidence that shows that the PTC underwent a reorganization to increase energy efficiency and conservation. In addition, there is evidence to suggest Hatalowich had issues with Plaintiff's work performance and possibly his attitude during TRC meetings.

In sum, Plaintiff repeatedly claims the PTC has a general practice of hiring politically connected individuals and employing a political patronage system. However, besides using these general terms, Plaintiff does not state any specific facts that show Defendants in this case were even aware of his political leanings. Although this court is aware of longstanding history of the PTC as it relates to political hiring practices (*see Heath v. Pa. Tpk. Comm'n*, 1:10-cv-494 (M.D. Pa. 2010)), at this stage of the litigation, Plaintiff must produce some evidence that

Defendants were aware of Plaintiff's political views and these views contributed to his termination with the PTC.  Because Plaintiff has failed to produce such evidence, the court will grant summary judgment in favor of Defendants on this issue.

### c.   __Retaliation__

Plaintiff next claims he was retaliated against in November 2009 when Plaintiff was not hired for a position he applied for and it instead went to a candidate Plaintiff believes was less qualified.

In order to establish a claim for First Amendment retaliation, "a plaintiff must prove '(1) that he engaged in constitutionally-protected activity; (2) that the [public agency] responded with retaliation; and (3) that the protected activity caused the retaliation.'" *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010) (citing *Eichenlaub v. Twp. of Indiana,* 385 F.3d 274, 282 (3d Cir. 2004)).

First, the court cannot discern what constitutionally-protected "activity" Plaintiff was engaged in.  As noted above, Plaintiff's discontent seems to be more with the method by which contractors where chosen and his belief that the best candidate was not always awarded the contract.  In addition, Plaintiff alleges to have opposed the process by which certain employee candidates were hired.  However, Plaintiff, by his own admission, not only thought the candidate interviewed and hired were highly qualified, and he never voiced any concern to anyone other than Mr. Jansen to whom he claimed he was simply "venting."  It is hard to see how the court can protect an activity that Plaintiff never actually engaged in.  Plaintiff has not stated, for example, that he openly expressed his political viewpoints, and that these viewpoints were shunned.  Nor has he claimed that he was asked to participate in any political activities.  He openly admits he did *not* voice his concerns to anyone

14

within the PTC apart from his "venting" to his then supervisor.   Plaintiff was informed in November 2009 that he did not receive the position for which he had applied and Plaintiff subsequently filed this lawsuit in October 2010.  Therefore, the filing of the lawsuit can also not be the basis for which Plaintiff claims retaliation. Because the court cannot say that Plaintiff's non-actions in this case amount to politically protected activity that it can be shown caused the retaliation alleged. Therefore, Plaintiff's retaliation claim likewise fails.

**IV.**          <u>**Conclusion**</u>

          For the reasons state above, Plaintiff has failed to show that his political affiliations were a substantial or motivating factor in his termination and thus, Plaintiff's First Amendment claim fails as a matter of law.  Likewise, Plaintiff has failed to show he was retaliated against for his political activities.  As such, Defendants' summary judgment motion will be granted.  An appropriate order will issue.

                                        s/Sylvia H. Rambo
                                        SYLVIA H. RAMBO
                                        United States District Judge

Dated:  August 17, 2012.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT M. WALLETT,** | : | |
| **Plaintiff** | : | **Civ. No. 1:10-CV-2092** |
| | : | |
| **v.** | : | **Honorable Sylvia H. Rambo** |
| | : | |
| **PENNSYLVANIA TURNPIKE** | : | |
| **COMMISSION, JOSEPH G.** | : | |
| **BRIMMEIER and GEORGE M.** | : | |
| **HATALOWICH, :** | | |
| | : | |
| **Defendants** | : | |

## O R D E R

For the reasons set forth in the accompanying memorandum of law, it is **HEREBY ORDERED THAT**, Defendants Pennsylvania Turnpike Commission, Joseph G. Brimmeier and George M. Hatalowich's motion for summary judgment (Doc. 34) is **GRANTED**.  Plaintiff's Motion for Disclosure (Doc. 38) and Defendants' Motion in Limine (Doc. 40) are deemed **MOOT**.  The clerk of court is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiff and **CLOSE** the file.

                                        s/Sylvia H. Rambo
                                        SYLVIA H. RAMBO
                                        United States District Judge

Dated:  August 17, 2012.